## ROSE MFG. CO. v. WESTERN UNION TELEGRAPH CO.   (No. 8778.)

(Court of Civil Appeals of Texas. Dallas. April 7, 1923. Rehearing Denied May 5, 1923.)

1. **War ⬤=31—Rights of citizens determined by courts, and not by military tribunals.**

The country does not cease to be a constitutional government because engaged in war, and the rights of the citizens are to be determined by the courts, and not by military tribunals, so long as the courts can function.

2. **War ⬤=31—Military power can only be exercised when civil arm of government powerless.**

Martial law can only exist, and military power can only be exercised over the property of the citizen, when the civil arm of the government is powerless because of invasion, insurrection, or anarchy, and when the necessity ceases the military power must end.

3. **Telegraphs and telephones ⬤=50—Not liable for failure to deliver message suppressed by military censor.**

Where telegraph operator was also military censor and had instructions to submit to chief censor telegrams for certain party, and was directed by him to kill message addressed to such party, the telegraph company was not liable for failure to deliver, as performance was rendered impossible by governmental order.

4. **Telegraphs and telephones ⬤=48—Whether operator acted as such or as military censor must be determined from his standpoint.**

Whether telegraph operator, who was also military censor, acted as operator or as censor in submitting telegram to the chief censor at Washington, must be determined from his standpoint and as it appeared to him at the time he received the message.

5. **Evidence ⬤=171—Testimony that addressee of telegram was on list of suspects admissible on question of operator's capacity in submitting telegram to chief censor.**

On question whether telegraph operator acted in his capacity as such or as military censor in submitting telegram to the chief cen-

sor, his testimony that addressee's main office was on alien enemy list and branch office to which message was addressed on enemy suspect list was admissible over objection that it was secondary evidence.

**6. Evidence ⬩46—Judicial notice not taken of secret confidential orders of chief military censor.**

The courts take judicial knowledge only of public orders of heads of departments and their various bureaus, and not of secret confidential orders of the chief military censor.

**7. Telegraphs and telephones ⬩75—Finding of censor's authority to prevent giving of notice of suppression of telegram held immaterial.**

Jury finding as to whether military censor had authority to prevent telegraph company from notifying sender of telegram that it had been suppressed by government censorship was immaterial, where there was no evidence that the company had knowledge of its suppression before the sender had such knowledge.

Appeal from District Court, Dallas County; Kenneth Foree, Judge.

Action by the Rose Manufacturing Company against the Western Union Telegraph Company. From a judgment for defendant, plaintiff appeals. Affirmed.

Etheridge, McCormick & Bromburg and S. M. Leftwick, all of Dallas, for appellant.

Flippen & Miller, of Dallas, for appellee.

JONES, C. J. Appellant is a private corporation with its domicile and place of business in the city of Dallas.

A. Canavati & Bro. is a firm of merchants doing business in the city of Eagle Pass, Tex. They also have a business house at Torreon, in the republic of Mexico, and had done business in these cities for a number of years. It appears that the house at Torreon was the main house, and the one at Eagle Pass a branch house.

On December 14, 1917, A. Canavati & Bro. offered to sell to appellant 30,000 yards of denim at 27 cents per yard, delivery to be made from their house in Eagle Pass. A sample of the goods was called for by appellant and sent to it from Eagle Pass, with the instruction that the price quoted would only hold good for immediate purchase. This sample was received on or about December 18, 1917, and on said date appellant undertook to send to the Eagle Pass firm a telegram accepting the offer of sale at the price quoted for the 30,000 yards of said cloth. The telegram was as follows:

"A. Canavati & Bro., Eagle Pass, Texas. Shipment freight full quantity denim offered price quoted yours fourteenth. Rose Mfg. Co."

This telegram was prepaid and delivered to appellee's agent in Dallas and transmitted from Dallas to Eagle Pass on December 18, 1917, at 10:10 a. m., but was never delivered to the addressee.

On December 31, 1917, appellant addressed a letter to A. Canavati & Bro., at Eagle Pass, Tex., reciting that the telegram of acceptance of their proposition in regard to the purchase of the cloth had been sent on December 18th, and that it had not heard anything with reference to the shipment of denim. A. Canavati & Bro. replied by letter, stating that they had not received the telegram of acceptance, nor would they sell the denim then at the quoted price, as this commodity has advanced.

When this message of acceptance of said offer was received at Eagle Pass, it was taken in charge by the United States telegraphic censor, and a copy at once dispatched to censor headquarters at Washington, and on December 20, 1917, Gen. McIntyre, the head of this department, sent to the military censors at Eagle Pass the following telegram: "Kill message eighteenth signed Rose Mfg. Co. [signed] McIntyre." In consequence of this order, the message was never delivered nor was appellant notified of this fact.

Appellant filed this suit to recover damages from appellee because of its alleged breach of contract in failing to deliver the message, alleging that it suffered damages in the sum of five cents per yard on the said 30,000 yards of denim, same being the difference in the market value of the denim at the time appellant was informed of the failure to deliver its message and the price for which it would have obtained the denim had said message been promptly delivered.

Appellant seeks a recovery on the theory that the act of Congress authorizing the President to establish the military censorship, as well as the proclamation of the President ordaining and establishing the censor board, did not permit or allow a censorship of telegrams from one point in the United States to another point in the United States, but only applied to messages passing beyond the border of the United States or messages originating beyond such border and coming into the United States, and that, as this was a domestic message, the "killing" of it by the censor was illegal, and such act cannot be pleaded in justification of appellee's failure to do that which it had contracted to do.

Appellee answered by a plea in abatement, based on an allegation that appellant's petition presented a cause of action solely against the government of the United States, and that by reason thereof the trial court was without jurisdiction to hear and determine the cause. It also raised this same question by special exception. It followed this with a special answer, pleading, by way of reference only, the joint resolution of Congress of April 6, 1917, declaring a state of war with Germany, and the executive orders

---

⬩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

of the President of date April 28, 1917, and June 7, 1917, claiming that such act of Congress and said executive orders authorized the appointment of the board of censors and authorized the action taken in reference to the message forming the basis of this suit, and further alleging that appellee had no control or voice in, and was in no way responsible for, the action of the military censor in killing the said message.

Appellee further pleaded, by way of reference only, the act of Congress of October 6, 1917, commonly called the "Trading with the Enemy Act," and the executive order of date October 12, 1917, under which specific act the President of the United States established the said board of censors, and specially pleaded the reference of the message by the Eagle Pass censor to the censor board at Washington and its resultant action in killing the message.

Appellee further pleaded that, when the message was delivered to it in Dallas, it acted with diligence and dispatch and same was promptly transmitted to Eagle Pass, Tex., where it would have delivered the message to the addressee without delay, except for the intervening act of the military authorities.

All of these defenses were excepted to by appellant in its supplemental petition as constituting no defense to appellant's cause of action.

The trial court overruled appellee's plea in abatement and exceptions, and also appellant's exceptions, and the case was tried to a jury, and judgment rendered in favor of appellee. Under proper assignments of error the case is brought to this court for review of the action of the trial court in overruling appellant's exceptions, in entering a judgment on the verdict returned by the jury, and on assignments of error complaining of the admission of certain evidence.

[1, 2] It is not necessary for a disposition of this case to notice separately appellant's assignments of error. Suffice it to say that every question that could be legitimately raised that would tend to establish its right of recovery has been properly raised and presented to this court in a very able manner, both by written brief and oral argument. These assignments are based on the erroneous assumption that this suit is one which involves the constitutional rights of the citizen, on the one hand, and the powers of the government in time of war, on the other. We agree with appellant that this country does not cease to be a constitutional government because it becomes engaged in war. The rights of the citizen are to be determined by the courts of the country, and not by military tribunals so long as the courts can function. Marshal law can only exist and military power can only be exercised over the property of the citizen when the civil arm of the government becomes powerless because of invasion, insurrection, or anarchy. Marshal law and military power over the citizen and his property are based upon and limited by necessity. Whenever this necessity ceases, such military power must end.

If this suit were against the military censors who were responsible for the "killing" of the message in question, or against the government under legislative permission, then all the questions raised by appellant touching the necessity for, and the validity of, the act of the government, through its military censors, in destroying a property right of appellant by the suppression of the message, would be matters of pertinent investigation. In the tribunal where such a case is under judicial investigation the principles of law as announced in Ex parte Milligan, 4 Wall. 2, 18 L. Ed. 281, U. S. v. Cohen Grocery Co., 255 U. S. '81, 41 Sup. Ct. 298, 65 L. Ed. 516, 14 A. L. R. 1045, Mitchell v. Harmony, 13 How. 115, 14 L. Ed. 75, and other similar cases cited by appellant, would find application.

[3] This case comes under another class of cases, to wit, that class in which performance of a contract is rendered impossible by an order of the government preventing such performance. It was established by evidence in this case that previous to the delivery of the telegram forming the basis of this suit a board of censors had been established by executive order issued under power granted by Congress, and to this board had been committed the power to suppress telegrams either passing from a foreign country into the United States, or passing from the United States into a foreign country, whenever in the judgment of the military censors this should be deemed necessary for the public safety. It is further established by the evidence that one J. T. Bolleter was a military censor at Eagle Pass, and also an employé of appellee as a telegraph operator. It appears to have been the policy of the government to designate as local censors the operative employés of appellee at the place where such censors were maintained. This perhaps was the most practical way in which complete supervision over messages passing through such office could be maintained. So that this man Bolleter, in messages over which the censor board had no jurisdiction, was an employé of appellee, but the moment he received a message over which the board of censors had jurisdiction, and about which message he had a duty to perform because of his position as a military censor, he ceased to be an employé or agent of appellee and became a military officer, with all of its consequent duties and responsibilities. Bolleter was on duty in appellee's office in Eagle Pass when this message was transmitted to that office and it was received by him. Did he receive it as an agent of appellee or as an employé of the military branch of the government? This depends upon whether it was a message over which the censor board had assumed jurisdiction. He testified that he had orders to de-

liver no message to A. Canavati & Bro. at Eagle Pass, for the reason that this firm at Eagle Pass was on the "suspect" list, and the firm at Torreon was on the "alien enemy" list; that, if a message was attempted to be sent through that office to A. Canavati & Bro. at Torreon, it was to be at once suppressed; if a message was to be delivered to A. Canavati & Bro. at Eagle Pass, no delivery should be made until a copy of the message was sent to the chief censor at Washington, and his judgment had upon it. In consequence of these orders, when this message was received it became his duty to take charge of it in his capacity as military censor, and not as the employé of appellee. As such military censor, it became his duty to withhold delivery and to transmit a copy to the head censor at Washington, and this duty he performed. On December 20th he received orders from Washington to "kill" this message, which order was carried out. These facts clearly establish that the failure to deliver this message to A. Canavati & Bro. was in no way due to any act of appellee, but was due to an order from the military branch of the government; that it was such a message as compelled Bolleter to take charge of as military censor, and his action in reference thereto was strictly in accordance with orders from the military power. It was utterly impossible for appellee to deliver the message or to do anything in reference to further its delivery. Its failure to carry out the contract was solely due to an order of the government, over which appellee had no control. This discharged it from any obligations consequent upon its failure to deliver the message to A. Canavati & Bro. Paige on Contracts, par. 2761, and authorities cited in note; Western Union Tel. Co. v. Conditt (Tex. Civ. App.) 223 S. W. 234; Dakota Central Tel. Co. v. South Dakota et al., 250 U. S. 163, 39 Sup. Ct. 507, 63 L. Ed. 910, 4 A. L. R. 1623.

[4, 5] It is urged by proper assignments that the evidence as to the military order to censor messages sent to A. Canavati & Bro. was improperly admitted, in that the proper predicate was not laid to offer the secondary evidence that was given at the trial to establish this fact. Also the same contention is made with reference to the evidence that A. Canavati & Bro., of Torreon, was on the alien enemy list, and A. Canavati & Bro., of Eagle Pass, Tex., was on the enemy suspect list. It is not believed that under the particular circumstances of this case these assignments are well taken. The only purpose of this testimony was to show whether or not Bolleter handled the message in his capacity as military censor or in his capacity as an employé of appellant. This must be determined from the standpoint of Bolleter and as it appeared to him at the time he received the message. For this purpose it was legitimate for him to testify to the facts in his possession and upon which he acted, when he assumed the rôle of military censor. It is not necessary to a decision of the case whether, as a matter of fact, this firm was on the suspect list and on the alien enemy list. The controlling fact is that this message was "killed" by the head censor at Washington and this is established by the telegram itself, directing the "killing" of the message. All that was necessary in reference to Bolleter's conduct was to show that he had acted as military censor, and these facts, though not the best evidence to prove the ultimate fact, were evidence to show that he did take charge of the message in his capacity as military censor, and not in his capacity as an employé of appellee.

[6] Appellee has submitted in its brief a confidential military censorship circular, issued by the chief military censor on July 13, 1917, and insists that this court should take judicial knowledge of this order. In this appellee is in error. The courts do not take judicial knowledge of secret confidential orders, but only of public orders, of the heads of departments and their various bureaus. This circular, however, is not necessary to the disposition of this case.

[7] The verdict of the jury on most of the issues submitted really amounts to no finding in this case. It was submitted to the jury on special issues. Many of the jury's answers to these special issues are in no way responsive to the question asked, and some of them the jury declined to answer for want of evidence, when, in fact, there was abundant evidence on the issue submitted. This, though, was on issues wholly immaterial to a proper disposition of the case under the view above expressed. The jury, however, did find as a fact that the message in suit was suppressed by the government censorship, and also that the military censor at Eagle Pass had authority to prevent appellee from notifying appellant of this fact. The evidence as to the first finding was undisputed, and the second finding was on an immaterial issue, for the reason that there was no evidence tending to show that appellee had knowledge of the "killing" of the message until after appellant had such knowledge.

We believe the only judgment that could have been entered in this case was one in favor of appellee. The case is therefore affirmed.

Affirmed.